UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

DANIELLE SOLLARS-D'ANNUNZIO,

                    Plaintiff,

v.                                                              Case No.  5:08-cv-80-Oc-GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                    Defendant.
_____/

## ORDER

Plaintiff appeals from a final decision of the Commissioner of Social Security ("the

Commissioner") denying her applications for a period of disability and disability insurance

benefits.  (Doc. 1.)  The Commissioner has answered (Doc. 11), and both parties have filed

briefs outlining their respective positions. (Docs. 18 & 19.)  For the reasons discussed

below, the Commissioner's decision is due to be **AFFIRMED**.

## I.  PROCEDURAL HISTORY

On February 3, 2004, Plaintiff filed applications for a period of disability, disability

insurance benefits, alleging a disability onset date of October 5, 2003.  (R. 21, 48, 85-87.)

Plaintiff's applications were denied initially and upon reconsideration.   (R. 49, 51.)

Thereafter, Plaintiff timely pursued her administrative remedies available before the

Commissioner and requested a hearing before an Administrative Law Judge ("ALJ").  (R.

74.)  The ALJ conducted Plaintiff's administrative hearing on October 13, 2006.  (R. 324-

361.)  The ALJ issued a decision unfavorable to Plaintiff on January 31, 2007.  (R. 21-28.)

On January 24, 2008, the Appeals Council denied Plaintiff's request for review of the hearing decision. (R. 6-10.) Plaintiff then appealed to this Court. (Doc. 1.)

## II. <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla in that the evidence must do more than merely "create a suspicion of the existence of [a] fact," and must include "such relevant evidence as a reasonable person would accept as adequate to support the conclusion."[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that

---

[1] *See* 42 U.S.C. § 405(g).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Richardson v. Perales, 402 U.S. 389, 401(1971); Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982); *accord* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; *accord* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding court must scrutinize entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding court must also consider evidence detracting from evidence on which Commissioner relied).

the Commissioner properly applied the law.[5]  The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6]  The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8]  First, if a claimant is working at a substantial gainful activity, she is not disabled.[9]  Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10]  Third, if a claimant's impairments meet or equal an impairment listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations, she is disabled.[11]  Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[12]  Fifth, if a claimant's impairments

---

[5] Keeton v. Dep't Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *See* Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] Id. § 404.1520(c).

[11] Id. § 404.1520(d).

[12] Id. § 404.1520(e).

(considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are found, the ALJ is

---

[13] Id. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2.
   In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.
Id. (internal citations omitted).

[16] Walker, 826 F.2d at 1002. Once the burden shifts to the Commissioner to show that the claimant can perform other work, the grids may come into play. Id.

[17] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987) ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19]  Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20]  Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

### III. SUMMARY OF THE RECORD EVIDENCE

At the time of the hearing, Plaintiff was twenty seven (27) years old.  (R. 75, 85.)  Plaintiff has a twelfth grade education and has previous work experience as a sales clerk.  (R. 90, 85.)  Plaintiff contends that she has been unable to work since October 15, 2003 due to migraine headaches, fibromyalgia, and depression.  (R. 85, 89.)

Plaintiff began receiving treatment for her headaches on August 14, 2000 and underwent a computed tomography ("CT") scan at the Naples Diagnostic Imaging Center.  (R. 162, 317.)  The CT scan was negative.  (R. 162.)  On August 22, 2000, an MRI of her brain was completed and the results were normal. (R. 163.)

---

[18] Walker, 826 F.2d at 1003.

[19] Wolfe v. Chater, 86 F.3d 1072, 1077-78 (11th Cir. 1996).

[20] See id.

[21] See Doughty v. Apfel, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

Shortly thereafter, Plaintiff began receiving treatment for her headaches from Dr. Eugene Finan. (R. 164-172, 316.) Plaintiff was diagnosed with headache syndrome, mixed migraine/tension and was prescribed the medications Elavil, Maxalt, and Ultram. (R. 172.) Plaintiff reported that Ultram had a positive effect on her headaches. (R. 171.) On February 26, 2001, Plaintiff returned to Dr. Finan and reported that her headaches were less severe and more under control, but her eyes remained heavy and she was tense every day. (R. 171, 315.) Plaintiff complained that she always had a slight headache and was treated with the medications Neurontin and Imitrex. (R. 171, 315.)

On April 5, 2002, Plaintiff returned to Dr. Finan for follow up treatment and reported that she still experienced daily headaches which were worse when she worked and attempted to focus on a task. (R. 170, 314.) According to Plaintiff, the medications Excedrin, Imitrex, and Neurontin helped her condition. Later in June of 2002, Plaintiff's headaches had worsened and Dr. Finan referred Plaintiff to a neurologist. (R. 169.) In July of 2002, Plaintiff had no great improvement with the prevention of her headaches; however, she stated that Neurontin helped ease her pain. Dr. Finan diagnosed severe, recalcitrant headaches and changed Plaintiff's medication again. (R. 168, 312.)

Throughout the Fall of 2002, Plaintiff had monthly appointments with Dr. Finan. Each month Plaintiff reported headache pain and Dr. Finan continued to adjust and add additional medications. (R. 166-67, 310-11.) Plaintiff reported that Neurontin helped her pain but because it had a sedating effect Dr. Finan changed her medication to Ultram. (R. 166, 310.)

On November 18, 2002, Plaintiff returned to Dr. Finan for follow up care and complained that her headaches caused her to cry all of the time. (R. 309.) During that appointment, Dr. Finan noted the August 2002 MRI test results, which were normal and changed her medication yet again. Five months later, Plaintiff returned to Dr. Finan for follow up care and he diagnosed Plaintiff with migraine/tension headaches which in his opinion were extremely resistant to preventative medications. (R. 164, 308.) However, Dr. Finan noted that Plaintiff had very immediate pain relief with the medication Ultram. (R. 308.)

In October of 2003, Plaintiff sought treatment from Dr. William Dakos, an allergy and environmental medicine physician. (R. 180-185, 300-301.) Plaintiff complained of myofascial head and neck pain, fatigue and depression. Dr. Dakos diagnosed Plaintiff with fibromyalgia, irritable bowel syndrome and depression. (R. 180, 183.) One month later, Plaintiff stated to Dr. Dakos that she hurt all over, was fatigued and the pain medication made her groggy. (R. 178.) At this appointment, Plaintiff was given a prescription for a sleep aid.

On November 11, 2003, Plaintiff was treated by Dr. Neal Krupp, a psychiatrist. (R. 260-261.) Plaintiff complained of headaches, body pain and depression. During the psychological evaluation, Plaintiff had a mildly constricted affect but was capable of smiling and some humor. (R. 261.) According to Dr. Krupp, Plaintiff was oriented, logical and coherent and her perception, cognition and thought processes were not distorted. Dr. Krupp diagnosed Plaintiff with a pain disorder and depression but ruled out major depression or a bipolar disorder.

On April 29, 2004, Plaintiff was evaluated by Dr. Robert Tober at the
Neighborhood Health Clinic for migraine headache pain. (R. 219.) Plaintiff reported that
she experienced bilateral headaches and Dr. Tober opined that she may suffer from
tension/cluster headaches and prescribed Neurontin and Ultram. Dr. Tober concluded
that Plaintiff had entractable migraine headaches and also suffered from a bipolar
disorder. During a follow up visit, Plaintiff reported that her migraines were partially
controlled with Ultram and Neurontin. (R. 218.)

From July of 2004 through June of 2005, Plaintiff complained of and was treated
for migraines, depression, anxiety and a bipolar disorder at Collier Health Services. (R.
222-224, 289-295.)

On May 27, 2004, Carol Deatrick, Ph.D. prepared a Psychiatric Review
Technique Form. (R.186- 203.) Dr. Deatrick opined that Plaintiff had an affective
disorder and a somatoform pain disorder but noted that her treatment notes revealed
essentially normal mental status examinations. (R. 190, 202.) In her functional capacity
assessment, Dr. Deatrick noted that Plaintiff's cognitive functioning may have been
reduced, with memory problems and a reduction in understanding; however, Plaintiff
was capable of basic, simple tasks and could follow simple directions. (R. 183.)
Although Plaintiff may have some deficits in sustained concentration and persistence of
pace, Dr. Deatrick stated that Plaintiff is able to complete simple, repetitive tasks and
demonstrated basic adaptive skills. While Plaintiff's social activities were reduced,
Plaintiff displayed basic social skills and was able to get along with the public and with
persons of authority. Dr. Deatrick summarized her position and stated that the majority
of credible evidence in the record revealed that Plaintiff appeared to be capable of very

simple, repetitive mental tasks.  Dr. Deatrick concluded that Plaintiff had mild restrictions of activities of daily living, mild limitations in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace and no episodes of decompensation.  (R. 200.)

On June 1, 2004, Plaintiff underwent a consultative examination by Patrick A. Ijewere, M.D.  (R. 204-206.)  Plaintiff complained of diffuse pain and aches radiating to the neck, arms, legs, and back and headaches that occurred daily.  (R. 204.)  Although, Plaintiff rated her pain as a 9/10 and the pain was accompanied with nausea a dark room, however, provided her mild relief.  Plaintiff reported that she had been depressed for 5 years and was receiving treatment from a psychiatrist and also took medications. Plaintiff complained that she had insomnia, a decreased appetite and suicidal ideation but stated that she had never attempted suicide.  During her general physical examination, Dr. Ijewere noted that Plaintiff did not have any pain or discomfort while she was seated nor did she have signs of tenderness in her major joints or have difficulty getting in or out of the chair or on the examination table.  (R. 205.)  Dr. Ijewere reported that Plaintiff's cognition was intact, she did not appear anxious and related well to his staff members.  However, Dr. Ijewere also noted that Plaintiff's mood was depressed and her affect flat.  Dr. Ijwere diagnosed Plaintiff with depression and headaches and encouraged her to seek psychiatric treatment.  (R. 204-209.)  According to Dr. Ijewere, Plaintiff displayed very few symptoms of fibromyalgia and he was unconvinced that she suffered from the disease.  (R. 206.)

On June 21, 2004, a Residual Functional Capacity Assessment Form was completed by a reviewing state agency examiner.  (R. 210-217.)  The reviewing

examiner determined that Plaintiff could occasionally lift/and or carry 50 pounds, frequently lift and or carry 25 pounds, stand and/or walk about six hours in an 8 hour work day, sit with normal breaks about 5 hours in an 8 hour work day, and was not limited to pushing and pulling. (R. 211.) Plaintiff did not have postural, manipulative, visual, communicative, or environmental limitations. (R. 212-213.) According to the state agency reviewing examiner, the residual functional capacity assessment reflected Plaintiff's pain allegations which were generally supported by the objective medical records. (R. 215.)

A second Mental Residual Functional Capacity Assessment was completed on November 1, 2004 by Martha W. Putney, Ph.D. (R. 225-228.) Dr. Putney opined that Plaintiff had moderate limitations in the ability to understand and remember detailed instructions; moderate limitations in the ability to carry out detailed instructions; moderate limitations in the ability to maintain attention and concentration for extended periods; and moderate limitations in the ability to complete a normal workday/week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of length of rest periods. (R. 225-226.) Dr. Putney noted that Plaintiff can be cooperative, appropriate and can understand and remember simple procedures and instructions. (R. 227.) Additionally, Dr. Putney stated that Plaintiff can adapt to simple work settings, perform simple mental tasks as her physical limitations permit and can make work decisions. (R. 227.)

Dr. Putney completed a Psychiatric Review Technique Form and noted that Plaintiff suffered from an affective disorder and a Somatoform/pain disorder. (R. 237-250.) Dr. Putney concluded that Plaintiff had mild restrictions of activities of daily living,

mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace and no episodes of decompensation. (R. 247.) Dr. Putney noted that during Plaintiff's mental status examination she was oriented, logical, coherent, and her perception, cognition and thinking was not distorted. (R. 249.)

On November 15, 2004, a Residual Functional Capacity Assessment was completed by a non-examining physician, Dr. Hamsaveni Kambam. (R. 229-236.) Dr. Kambam determined that Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, that she could stand and/or walk for about 6 hours in an 8 hour work day, she could sit with normal breaks about 6 hours in an 8 hour workday and did not have any limitations with pushing or pulling. (R. 230.) In addition, Dr. Kambam concluded that Plaintiff did not have any postural, manipulative, visual, communicative, or environmental limitations. (R. 231-233.)

Plaintiff was treated by Dr. Joseph Oibo with Family Care Specialists on November 22, 2005. (R. 263.) Plaintiff continued to complain of persistent headaches, fatigue and achiness. Although Plaintiff was able to sleep eight hours a night she reportedly experienced increased irritability, poor energy, feelings of worthlessness and isolation. Admittedly, Plaintiff stated she had done nothing to address her depression. Dr. Oibo diagnosed Plaintiff with headaches, diffuse myalgias, persistent fatigue, and a possible depressive disorder.

In June of 2006, Plaintiff began her treatment with Marion Citrus Mental Health Center. (R. 278.) Plaintiff reported that she was stable on her current medications. However, she continued to experience poor concentration, fatigue, and sleep problems.

Plaintiff was diagnosed with bipolar disorder and alcohol abuse and agreed to participate in a treatment plan. (R. 267, 280.)

On July 20, 2006, Plaintiff underwent a psychiatric assessment at the Marion Citrus Mental Health Center. (R. 273-276.) During the mental health examination, Plaintiff cooperated, displayed relevant speech, exhibited logical thought processes and was alert and oriented times three. (R. 275.) According to the psychiatrist, Plaintiff recalled three objects after five minutes, displayed fair remote memory, processed calculations and exhibited fair abstract abilities, including, insight and judgment. Plaintiff denied homicidal ideations and suicidal thoughts. During this visit, Plaintiff denied that she experienced any medical or physical issues. (R. 283.) During a follow up visit in September, the psychiatrist encouraged Plaintiff to get involved in activities, as opposed to staying at home, laying around and watching television. (R. 277.)

Plaintiff testified on her own behalf at the administrative hearing which was held on October 13, 2006. (R. 324-361.) Plaintiff testified that she weighed 100 pounds and was unable to gain weight due to her bipolar disorder. (R. 332.) According to Plaintiff, she last worked in 2005 and had been working approximately ten hours a week when she began to call in sick on the average of two days a week. (R. 334.)

Plaintiff stated that currently she was taking Lithium, Trazadone, and Cymbalta, the effects of which caused her to lie down approximately four or five hours a day. (R. 334-35, 337.) Plaintiff stated that an increase in her medications increased her fatigue. (R. 345.) Plaintiff testified that her headaches occurred daily, from morning to night and she described the pain as if her head was in a vice. (R. 337.) Plaintiff quantified her pain as a 5-6/10 but stated that on some days her pain level was an 8/10. (R. 349.)

12

However, the only pain medication Plaintiff took was Excedrin PM, an over-the-counter headache medication.  (R. 338, 351.)

Plaintiff stated that she does have a valid driver's license but did not like to drive. (R. 339.)  Plaintiff testified that she is able to do chores, including dishes, for approximately 15 to 20 minutes but then she must lie down.  (R. 342.)  Plaintiff does not cook but is able to heat up food in the microwave.  According to Plaintiff, she does not watch television or use a computer because she is unable to concentrate.  (R. 347.) Plaintiff is able to shop, but does so late at night so as to avoid people.  (R. 348.)

At the hearing, Plaintiff described herself as bipolar and stated that she has difficulty concentrating and with authority.  (R. 331, 339.)  Plaintiff rated her depression a 7/10 and stated that it caused her to stay inside her home on the average of three days a week.  (R. 349.)  Plaintiff reported that she had been seeing Dr. Patrick, a psychiatrist, once a month for the last five months.  (R. 336-37.)   Plaintiff testified that she has not been treated in the emergency room and has not attempted suicide.  (R. 348.)

In his review of the record, including Plaintiff's testimony and the medical records, the ALJ determined that Plaintiff has severe impairments of migraine headaches and an affective disorder.  (R. 23.)  However, the ALJ determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Appendix 1, Subpart P of Social Security Regulation No. 4.  (R. 23.)

The ALJ then found that Plaintiff retained the RFC to lift/carry 20 pounds occasionally and 10 pounds frequently; could stand/sit for 6 hours in an 8 hour workday

with normal breaks; must avoid frequent ascending or descending stairs; can perform pushing/pulling motions and activities that require bilateral dexterity; should not climb and could only occasionally stoop, crawl, and kneel; must avoid hazards in the workplace; due to her mental condition, she is limited to low stress, simple, unskilled work with one, two, and three steps instructions; and she cannot work in the close proximity of coworkers nor can she function as a member of a team or be in direct contact with the general public. (R. 23-24.)

The ALJ then determined that although Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, he did not find Plaintiff's statements concerning the intensity, duration and limiting effects of these symptoms entirely credible. (R. 24.) However, the ALJ did determine that Plaintiff was unable to perform her past relevant work as a sales clerk. (R. 26.)

The ALJ concluded that Plaintiff had the physical RFC to perform unskilled work but not in direct proximity with the public. (R. 26.) The ALJ used Rule 201.21 of the Medical-Vocational Guidelines (the "grids")[22] as a "framework" and found that Plaintiff had the RFC to perform light work and further found that Plaintiff was not disabled. (R. 27.) The ALJ then determined that Plaintiff's ability to perform all or substantially all of the requirements of this level of work may be impeded by Plaintiff's additional limitations. (R. 27.) To determine what extent that these limitations may effect Plaintiff's ability to perform work, the ALJ enlisted a vocational expert ("VE") to

_____

[22] 20 C.F.R. §404 subpt. P, app. 2, R. 201.21 & 202.22.

determine whether there were jobs that existed in the national economy for an individual with Plaintiff's age, education, work experience, and RFC.

David Pigue, a VE, testified in response to a hypothetical question posed during the administrative hearing. (R. 353-360.) The ALJ posed a hypothetical question that included an individual worker of Plaintiff's age, education and past relevant work experience; with a limitation to low stress, simple, unskilled work, with one, two or three-step instructions; who can lift and carry 10 pounds frequently and 20 pounds occasionally; who can sit and/or stand with normal breaks for a total of six hours of an eight-hour workday; with no frequent ascending or descending stairs; who can perform push and pulling motions with the upper and lower extremities and with activities requiring manual dexterity; who should avoid hazards in the work place; cannot climb but can occasionally balance, stoop, crouch, kneel, and crawl; who cannot work in proximity to co-workers or function as a member of a team or with direct contact with the public; and who can understand, remember and carry out simple job instructions. (R. 356-357.) Additionally, the ALJ included the limitation that the individual needed to work in a low-stress position. (R. 357.) Based upon this hypothetical, the VE testified that Plaintiff could not perform her past relevant work. (R. 357.)

The VE then opined that Plaintiff could perform other unskilled light work, specifically, a wire products assembler, DOT #728.684-022 and that there were 10,115 of these jobs statewide and 189,910 of these jobs available nationally. (R. 474.) Additionally, the VE testified that Plaintiff could perform the position of electronics worker DOT #726.687-010, and that there were157,119 of these jobs available nationwide and 7,928 of these jobs available in Florida.

The ALJ then modified the hypothetical to include a limitation in the ability to complete a normal work day and work week without interruptions and to be able to perform without an unreasonable number of and length of rest periods. (R. 358.) With this modification, the VE testified that this limitation would eliminate the ability of Plaintiff to perform other work.

Based upon the testimony of the VE and considering the Plaintiff's age, education, work experience, and residual functional capacity, the ALJ determined that Plaintiff is not disabled because she is able to perform other work that exists in significant numbers in the national economy. (R. 27.) Accordingly, the ALJ concluded that Plaintiff was not disabled at any time from October 5, 2003 through December 31, 2006, the date Plaintiff was last insured.[23] (R. 27.)

## IV. **DISCUSSION**

Plaintiff raises two issues on appeal. First, Plaintiff argues that the ALJ erred in finding that there were a substantial number of jobs that Plaintiff could perform because the VE's testimony conflicted with the Dictionary of Occupational Titles. Second, Plaintiff argues that the ALJ did not properly credit Plaintiff's allegations of pain and failed to provide specific and adequate reasons for rejecting those allegations. The Court will address Plaintiff's arguments in turn.

---

[23] To be eligible for disability insurance benefits under Title II of the Social Security Act, Plaintiff must establish that her disability began before her insured status expired. 42 U.S.C. § 423(a) and (c), 20 C.F.R. § 404.101, § 404.130, § 404.131; Wilson v. Barnhart, 284 F.3d 1219, 1226 (11th Cir. 2002). The record demonstrates that Plaintiff's insured status expired on December 31, 2006. (R. 75.) Consequently, Plaintiff must establish disability prior to that date.

**A.      The ALJ Did Not Err By Relying Upon the Testimony of the VE**

Relying upon Social Security Ruling ("SSR") 00-4p  - which requires that an ALJ explain and resolve any conflicts between a VE's testimony and the Dictionary of Occupational Titles ("DOT") - the Plaintiff contends that the case should be reversed and remanded because the ALJ failed to explain and resolve an alleged conflict between the limitation that Plaintiff must work in a low stress workplace and the DOT descriptions of the jobs identified by the VE. The Plaintiff argues that the two jobs identified by the VE that Plaintiff could perform  - wire worker or electronics worker - are not described in the DOT as low stress jobs and therefore are in conflict with the testimony of the VE. Plaintiff points to the fact that the description in the DOT does not state that the jobs are low stress and therefore by negative inference the jobs conflict with the requirement that Plaintiff can only perform low stress jobs. In addition to the fact that the DOT descriptions do not describe the jobs as low stress, Plaintiff points to the phrase  "attaining precise set limits, tolerance and standards" in the DOT description of the job of wire worker as connoting the job is not low stress and therefore in conflict with the testimony of the VE.

Plaintiff's argument is without merit for a variety of reasons. First, with regard to the descriptions in the DOT of wire worker and electronics worker, the descriptions do not  directly conflict with the requirement that the workplace must be low stress. Rather, the descriptions of both of these jobs in the DOT simply provide that there is no data

available regarding the psychological stress requirements of the jobs. As such, there is no direct conflict between the opinion of the VE and the description in the DOT.[24]

Secondly, with regard to the use of the phrase "attaining precise set limits, tolerance and standards" this description is contained in the job wire worker and not in the description of the job of electronics worker. The VE is only required to identify one job that Plaintiff could perform which is available in significant numbers in the national economy. Therefore, even assuming the phrase "attaining precise set limits, tolerance and standards" was liberally interpreted to mean the job is not low stress, that would only eliminate one of the two jobs identified by the VE. Moreover, during the hearing, the VE recognized Plaintiff's "low stress" limitation and testified that the position of wire worker and electronics worker "would be appropriate within those parameters." (R. 357.)

Additionally, Plaintiff's argument must fail even if the Court was to conclude that there was a conflict between the DOT and the testimony of the VE because SSR 00-4p only requires the VE to resolve the conflict when he is made aware of the conflict. Further, the law of the Circuit provides that where there is a conflict between the testimony of the VE and the description in the DOT the testimony of the VE trumps the DOT.

The ALJ has two obligations under SSR 00-4p with regard to reconciling any conflict between the testimony of the VE and the DOT. First, "[w]hen a VE...provides evidence about the requirements of a job or occupation, the adjudicator has an

---

[24] SOC. SEC. ADMIN., DICTIONARY OF OCCUPATIONAL TITLES § 728.684-022; SOC. SEC. ADMIN., DICTIONARY OF OCCUPATIONAL TITLES § 726.687-010.

affirmative responsibility to ask about any possible conflicts between that VE...evidence and information provided in the DOT."[25]  This means the ALJ must ask if there is a conflict.  The second requirement under SSR 00-4p provides that "when there is an apparent unresolved conflict between VE...evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE...evidence to support a determination or decision about whether the claimant is disabled."[26] This means that where the ALJ learns of a conflict he is required to discuss and resolve the conflict. In this case the ALJ complied with this obligation by directing the VE to point out any conflicts. The transcript of the hearing reflects the following colloquy:

> ALJ:  Let me request from you at the outset that if there are any conflicts with the information that you provide with the Dictionary of Occupational Titles including its companion publication, The Selected Characteristics of Occupations defined in the revised Dictionary of Occupational Titles, that you advise me.  Otherwise, I will assume there are no such conflicts.  Is that fair?
>
> VE:  Yes, Your Honor.

(R. 355.)  Accordingly, by expressly directing the VE to advise the ALJ of any inconsistencies, the ALJ satisfied the first requirement of SSR 00-4p. Where, as here, the ALJ has requested the VE to point out any conflicts and there is no evidence that a

---

[25]  Social Security Ruling 00-4p, 65 Fed. Reg. 775759-01, 2000 WL 1765299 (Dec. 4, 2000).

[26]  Id.

conflict was otherwise brought to the attention of the VE, there is no violation of SSR 00-4p.[27]

Plaintiff incorrectly assumes SSR 00-4p is violated simply where an inconsistency may exist. This interpretation is generally at odds with the law in the Eleventh Circuit - predating SSR 00-4p - concerning the binding effect of the testimony of a VE when there is a conflict. Before SSR 00-4p was promulgated in December 2000, several circuits had taken different approaches in resolving a conflict between the testimony of a VE and the DOT.[28] The Eleventh Circuit in *Jones v. Apfel*[29] held that "...when the VE's testimony conflicts with the DOT, the VE's testimony 'trumps' the DOT."[30] The court in *Jones* reasoned that the VE's testimony may be followed because the "DOT is not the sole source of admissible information concerning jobs" and that by

_____

[27] *See, e.g.* Brijbag v. Astrue, No. 8:06-cv-2356-T-MAP, 2008 WL 276038, at *2 (M.D. Fla. Jan. 31, 2008)("the ALJ need not independently corroborate the VE's testimony and should be able to rely on such testimony where no apparent conflict exists with the DOT."); Martin v. Commissioner of Social Security, 170 Fed. Appx. 369, 2006 WL 509393, at *4-5 (6th Cir. 2006)(unpublished)(holding that "[n]othing in SSR-004p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct" and therefore "[b]ecause [theVE] did not bring the conflict to the attention of the ALJ, the ALJ did not need to explain how the conflict was resolved."); Haas v. Barnhart, 91 Fed. Appx. 942, 947-48 (5th Cir. 2004)(where conflict not brought to the attention of the ALJ it was not reversible error for the ALJ to rely upon the testimony of the VE); Lembke v. Barnhart, 2006 WL 3834104 *15 (W.D. Wis. 2006)(reversal is not warranted where plaintiff identifies a conflict after the hearing but during the hearing no conflict was identified so long as the ALJ complied with SSR-004p by asking the VE at the hearing to identify conflicts); Gibbons v. Barnhart, 85 Fed. Appx. 88, 93 (10th Cir. 2003)(no error under SSR 004p where the VE did not identify conflicts with the DOT).

[28] *See,* cases collected in Donahue v. Barnhart, 279 F.3d 441, 445 (7th Cir. 2002)("three circuits hold that an ALJ always may prefer the testimony of a vocational expert over the conclusions in the *Dictionary* ... [T]hree more circuits allow the ALJ to accept a vocational expert's position, but only after providing an explanation(with record support) for doing this ... (citations omitted)").

[29] 190 F.3d 1224, 1229-1230 (11th Cir. 1999).

[30] Jones at 1229-1230.

20

its own wording "the SSA itself does not consider the DOT dispositive."[31] Thus, under *Jones* an ALJ may rely upon the testimony of a VE without first resolving any conflict with the DOT.

After *Jones* was decided, SSR 00-4p was promulgated. The promulgation of SSR 00-4p does not, however, undo the rule in *Jones* nor does the ruling by its own wording, mandate that an ALJ has a duty independently to investigate whether there is a conflict between the VE's testimony and the DOT.

Moreover, even if there was a conflict between the VE testimony and the DOT - and the Court is not convinced there is - a more fundamental problem arises regarding Plaintiff's argument. That is, Plaintiff's argument is based on the incorrect premise that a Social Security ruling can trump a decision from the Circuit. As a panel of the Circuit recently held in *Miller v. Commissioner Of Social Security,*[32] because social security rulings do not bind the courts, even where an inconsistency exists between the testimony of a VE and the DOT, an ALJ is entitled to rely upon the testimony of the VE, without resolving the conflict. This is so, according to *Miller,* because the rule in *Jones* that the "VE's testimony trumps the DOT," is binding precedent in this Circuit, notwithstanding the promulgation of SSR 00-4p.[33]

Accordingly, Plaintiff's argument that the ALJ erred in relying upon the testimony of the VE fails for multiple reasons.

---

[31] *Id.* at 1230.

[32] 246 Fed. Appx. 660, 662, 2007 WL 2461771 (11th Cir. 2007)(*per curiam*).

[33] *See also,* Corbitt v. Astrue, 2008 WL 1776574 at *6 (M.D. Fla. 2008) in which Judge Snyder concluded that in light of the *Miller* decision *Jones* is still binding precedent and thus failure to resolve a conflict prior to relying upon the VE does not constitute error.

**B.** *The ALJ Did Not Err In Rejecting Plaintiff's Allegations of Pain*

Plaintiff's second argument is that the ALJ erred by failing to articulate specific and adequate reasons for rejecting Plaintiff's allegations of pain.

The law on this issue is straightforward. If an ALJ decides to discredit a claimant's testimony about subjective complaints, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.[34]  While an adequate credibility finding need not cite "particular phrases or formulations [...] broad findings that a claimant lacked credibility and could return to her past work alone are not enough to enable a court to conclude that the ALJ considered her medical condition as a whole."[35]  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.[36] However, a lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.[37]  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding."[38]

---

[34] Foote v. Chater, 67 F.3d 1553, 1561-62 (11th Cir. 1995); Jones v. Department of Health and Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on substantial evidence).

[35] Foote at 1562-1563.

[36] Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

[37] Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982).

[38] Foote, 67 F.3d at 1562 (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983) (holding that although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

In the instant case, the ALJ utilized the Eleventh Circuit's pain standard "threshold"[39] assessment to Plaintiff's subjective complaints by noting the Plaintiff's migraine headaches and affective disorder. While the ALJ did not cite the exact language of the standard, he did state that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 C.F.R. Sections 404.1529 and SSRs 96-4p and 96-7p." (R. 16.) This language, a paraphrase of the pain standard, along with the supporting findings, shows that the ALJ applied the pain standard. Moreover, the ALJ cited 20 C.F.R. §§ 404.1529, which contains the same language regarding subjective testimony that the Eleventh Circuit interpreted when initially establishing the pain standard.[40]

In applying the pain standard, the ALJ found that Plaintiff met the initial burden of showing the underlying medical conditions of migraine headaches and an affective disorder, which are conditions that could reasonably be expected to produce the alleged symptoms. Once Plaintiff met this initial burden, however, the ALJ found Plaintiff's statements concerning the "intensity, duration and limiting effects of these symptoms [were] not entirely credible." (R. 24.)

The ALJ discussed a number of reasons for rejecting Plaintiff's allegations of pain, each of which is supported by competent substantial evidence. First, the ALJ explained that the objective medical evidence was inconsistent with Plaintiff's testimony that she is debilitated by her headaches and depression. In reaching this conclusion the

---

[39] Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992). .

[40] *See* Wilson, 284 F.3d at 1226.

23

ALJ relied upon the fact that Plaintiff had a negative CT scan of her sinuses (R. 162) and the MRI of Plaintiff's brain revealed normal results. (R. 163.)

The ALJ also pointed to several inconsistencies that minimized Plaintiff's credibility. For example, the ALJ pointed out that Plaintiff's complaints of debilitating pain were inconsistent with the medical records which evidenced that Plaintiff's medication had a positive effect on her pain. Plaintiff reported that her headaches seemed less severe and were a little more under control (R. 171); her headaches were worse without Neurontin (R. 170); and taking Ultram provided very immediate pain relief. (R. 308.) Additionally, the treatment notes disclose that simply taking Excedrin, an over the counter headache medicine, helped Plaintiff's condition. (R. 170.) Indeed, notwithstanding Plaintiff's complaints of disabling pain the only pain medication Plaintiff was taking at the time of the hearing was Excedrin. (R. 338, 351.)

Additionally, in explaining why he did not find Plaintiff's allegations of pain entirely credible the ALJ explained that Plaintiff missed appointments, was noncompliant with medications, and stayed out of treatment for long periods of time - all of which is inconsistent with an individual experiencing disabling pain. The ALJ's conclusion is well supported by the record. The evidence of record discloses that Plaintiff failed to keep at least three appointments (R. 173, 175, 259) and that she did not seek treatment from April 2003 to October 2003 (R. 164-65) and then again from December of 2003 through July of 2004. (R. 173-75.) Furthermore, on at least two occasions, treatment records disclose that Plaintiff was noncompliant with her medications. (R. 256, 258.)

Plaintiff ignores this discussion and instead argues that the ALJ erred by applying "sit and squirm jurisprudence" because the ALJ commented in his decision

about his personal observations of Plaintiff at the hearing. While the ALJ noted that the Plaintiff "did not appear to be in any obvious discomfort while walking into or out of the hearing room," this comment standing alone does not constitute error or establish that the ALJ employed "sit and squirm" jurisprudence. To the contrary, there is nothing that prohibits an ALJ from considering a claimant's appearance and demeanor during a hearing. "Sit and squirm" jurisprudence, however, means that an ALJ must not impose his observations in lieu of considering the medical evidence presented.[41] That is not what happened in this case. The ALJ considered and discussed, at length, Plaintiff's medical record and then only mentioned at the conclusion of his discussion a comment about Plaintiff's appearance and demeanor during the hearing.

Indeed, the ALJ's comment that Plaintiff did not exhibit any obvious discomfort while walking into or out of the hearing room and that she was able to sit throughout the course of the hearing is consistent with the treatment notes from Dr. Patrick A. Ijewere, the consultative examiner, who recorded that Plaintiff did not experience pain or discomfort while seated, nor did she experience any difficulty getting in or out of the chair or on and off the examination table. (R. 205.)

The ALJ also noted that despite Plaintiff's allegations of mental impairments, Plaintiff was able to maintain attention and concentration throughout the course of the proceedings and was capable of responding to questions and answering in a responsive and thoughtful manner without evidence of deficits in her ability to concentrate and remember. This observation by the ALJ also is consistent with the medical evidence

---

[41] Norris v. Heckler 760 F.2d 1154, 1158 (11th Cir. 1985).

from Dr. Neal Krupp, a psychiatrist, who noted that Plaintiff was coherent, logical, oriented, and that Plaintiff's perception, cognition and thought processes were not distorted. (R. 261.) This observation is also consistent with the medical evidence from Dr. Ijewere, who found Plaintiff's cognition was intact and reported that Plaintiff related well to his staff. (R. 205.) Furthermore, the records from Plaintiff's mental health examination at Marion Citrus Mental Health Center, disclose that Plaintiff cooperated, displayed relevant speech, exhibited logical thought processes and was alert and oriented times three. (R. 275.) Lastly, those same treatment notes revealed that Plaintiff was able to recall three objects after five minutes, display fair remote memory, process calculations and exhibit fair abstract abilities, including, insight and judgment. Thus, the medical evidence of record is wholly consistent with the ALJ's conclusion and consistent with the ALJ's observations at the hearing. As such, the ALJ did not improperly utilize "sit and squirm" jurisprudence in assessing Plaintiff's credibility with regard to her pain or with regard to her mental impairments.

In sum, the Court concludes that the ALJ articulated specific and adequate reasons, well supported by substantial evidence of record, for rejecting Plaintiff's allegations of pain. Where, as here, the ALJ has made a thorough and well supported credibility determination it is not the role of this Court to re-weigh the evidence or to substitute its discretion for that of the ALJ.[42]

---

[42] Wolfe v. Chater, 86 F.3d 1072, 1076 (11th Cir. 1996).

Accordingly, for all of the reasons discussed above, the decision of the Commissioner is due to be **AFFIRMED** and the Clerk is directed to enter final judgment consistent with this Order and to close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on February 6, 2009.

GARY R. JONES
United States Magistrate Judge

Copies to:
All Counsel